Slip Op. 01-08

# UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: Judge Judith M. Barzilay**

_____

|  |  |  |
|---|---|---|
| USEC, INC. and UNITED STATES ENRICHMENT CORPORATION, | : | |
| Plaintiffs, and | : | |
| AD HOC COMMITTEE OF DOMESTIC URANIUM PRODUCERS, | : | |
| Plaintiff, | : | Consol. Court No. 99-08-00547 Public Version |
| v. | : | |
| THE UNITED STATES, | : | **Before: Barzilay, Judge** |
| Defendant, | : | |
| and | : | |
| THE GOVERNMENT OF KAZAKHSTAN, NATIONAL ATOMIC COMPANY KAZATOMPROM, and NUKEM, INC., | : : : | |
| Defendant-Intervenors. | : | |

_____

[Plaintiffs' motions for judgment upon the agency record denied.]     Decided: January 24, 2001

*Akin, Gump, Strauss, Hauer & Feld, LLP, Valerie A. Slater, Karen L Bland, Catherine J. Finnegan, Nathan J. Oleson, (Stephen J. Claeys),* for Plaintiff Ad Hoc Committee of Domestic Uranium Producers.

*Steptoe & Johnson LLP, Richard O. Cunningham, Sheldon E. Hochberg, (Eric C. Emerson)., Shannon P. MacMichael, Amy Howe,* for Plaintiffs USEC Inc., and United States Enrichment Corporation.

*(Lyn M. Schlitt),* General Counsel, *James A. Toupin,* Assistant General Counsel, *Michael K. Haldenstein, Michael Diehl,* Office of the General Counsel, U.S. International Trade Commission, for Defendant.

*Shearman & Sterling***,** *(Thomas B. Wilner)*, for Defendant-Intervenors the Republic of Kazakhstan and the National Atomic Company Kazatomprom.

*White & Case, LLP, Carolyn B. Lamm, Adams C. Lee, Christina C. Benson, (David L. Elmont),* for Defendant-Intervenor NUKEM, Inc.

**OPINION**

**BARZILAY, JUDGE:**

## I. INTRODUCTION

Plaintiffs in this case are domestic uranium producers challenging the United States International Trade Commission's ("ITC" or "Commission") final negative determination in *Uranium from Kazakhstan*, 64 Fed. Reg. 40897 (July 28, 1999), in which the Commission ascertained that uranium imported from Kazakhstan caused neither material injury nor threat of material injury to the domestic uranium industry. Before the court are Plaintiffs' USCIT R. 56.2 *Motions for Judgment Upon the Agency Record* ("*Pls.' Mot*"). Plaintiffs bring this action pursuant to 19 U.S.C. §§ 1516a(a)(1)(c) and 1516a(a)(2)(B)(ii)(1994); the ITC opposes Plaintiffs' motions. Defendant-Intervenors NUKEM, Inc., ("NUKEM") and the Republic of Kazakstan and the National Atomic Company Kazatomprom ("Kazatomprom") also filed briefs opposing Plaintiffs' motions. The court exercises jurisdiction pursuant to 28 U.S.C. § 1581(c)(1994).[1] For the reasons set out in the following opinion, the court denies Plaintiffs' *Motions for Judgment Upon the Agency Record.*

## II. BACKGROUND

*A.    The Antidumping Investigation and the Kazakh Suspension Agreement*

On November 8, 1991, Plaintiffs filed with the U.S. Department of Commerce ("Commerce" or "ITA") and the ITC a petition alleging that imports of uranium from the Union of Soviet Socialist Republics ("Soviet Union" or "USSR") had been sold at less than fair value ("LTFV") and seeking the imposition of antidumping duties. *See Pl. Ad Hoc Committee of Domestic Uranium Producers' Mem. in Supp. of Its Rule 56.2 Mot. for J. on the Agency R.* ("*Ad Hoc Br.*") at 5.

---

[1]28 U.S.C. § 1581(c) provides: "The Court of International Trade shall have exclusive jurisdiction of any civil action commenced under section 516A of the Tariff Act of 1930."

On November 12, 1991, the ITC initiated a preliminary investigation to determine whether the domestic industry was materially injured, threatened with material injury, or materially retarded due to uranium from the USSR, and on November 29, 1991, Commerce initiated an investigation to determine whether imports of Soviet uranium were likely to be sold in the United States at LTFV.[2]  The Commission issued a preliminary injury determination on December 23, 1991, concluding that uranium imports from the Soviet Union materially injured the U.S. uranium industry.  *Id.*

On December 25, 1991, the Soviet Union dissolved into twelve independent states; on March 25, 1992, Commerce opted to continue the antidumping investigation against each of the twelve states. *Id.* at 6.  The Government of Kazakstan ("GOK"), a non-market economy ("NME"), and Commerce signed a suspension agreement on October 16, 1992, pursuant to 19 U.S.C. § 1673c(1)(1993).[3] Following acceptance of the Kazakh Suspension Agreement, the ITC suspended its investigation of uranium from Kazakhstan. *Id.* at 7.  Under the terms of the agreement, Kazakstan was permitted to: (a) ship limited amounts of uranium pursuant to pre-existing contracts; (b) bring uranium into the United

---

[2]Section 732(b)(1) of the Tariff Act of 1930, codified at 19 U.S.C. § 1673a(b)(1), provides:
An antidumping proceeding shall be initiated whenever an interested party
described in subparagraph (C), (D), (E), (F), or (G) of section 1677(9) of this
title files a petition with the administering authority, on behalf of an industry,
which alleges the elements necessary for the imposition of the duty imposed
by section 1673 of this title, and which is accompanied by information
reasonably available to the petitioner supporting those allegations. The
petition may be amended at such time, and upon such conditions, as the
administering authority and the Commission may permit.

[3] Section 732(b)(1) of the Tariff Act of 1930, codified at 19 U.S.C. § 1673c(l) allows Commerce and a non-market economy to enter into a suspension agreement to restrict the volume of subject imports if the agreement, among other criteria, prevents price suppression and undercutting of domestic products.  The Kazakh Suspension Agreement was published at *Antidumping; Uranium from Kazakhstan, Kyrgyzstan, Russia, Tajikistan, Ukraine, and Uzbekistan; Suspension of Investigations and Amendment of Preliminary Determinations,* 57 Fed. Reg. 49, 220 (Oct. 30, 1992).

States temporarily for processing and then re-export the uranium to third countries; and (c) export a limited quantity of uranium to the United States under a price-tiered quota.[4]

In 1998, the suspension agreement became economically unsound for Kazakhstan. Following dissolution of the Soviet Union, Kazakh supplies dropped, making Kazakhstan unable to meet the quota terms of the suspension agreement in both 1996 and 1997. In 1998, uranium prices fell to below $12.00 per pound, which prevented Kazakhstan from exporting uranium to the United States. After attempting to negotiate an amendment to the suspension agreement, Kazakhstan filed its termination request, which became effective on January 11, 1999. Commerce and the ITC then resumed their investigations of imports of Kazakh uranium. On June 10, 1999, Commerce published its *Final LTFV Determination*, affirming that sales of uranium from Kazakhstan had been made at LTFV at a margin of 115.82 percent. *See Final Determination of Sales at Less Than Fair Value: Uranium from the Republic of Kazakhstan*, 64 Fed. Reg. 31179, 31188 (June 10, 1999) ("*Final LTFV Determination*"). The margin rate was derived from the average of the underselling alleged in the petition. *Id.* at 31184. On July 23, the ITC issued its negative final material injury and threat of material injury determination. *See Uranium from Kazakhstan*, USITC Pub. 3213, Inv. No. 731-TA-539-A (Final) (July 1999) ("*Final Determination*").[5]

B.      *The Kazakh Stockpile*

When the Soviet Union dissolved in 1991, there was an inventory in Kazakstan of uranium ($UF_6$

---

[4]Under the terms of the price-tiered quota, no imports from Kazakstan were allowed into the domestic market if the United States market prices fell below $12.00 per pound of $U_3O_8$; one million pounds of $U_3O_8$ were allowed per year if the prices in the United States were between $12.00 and $13.99 per pound; and if prices exceeded $14.00 per pound, greater amounts were allowed. *See Uranium from Kazakhstan*: Final Report to the Commission on Investigation No. 731-TA-539-A (Final), (June 25, 1999) ("*Final Report*").

[5]All voting Commissioners concurred in the result.

and $UO_2$), that was enriched in facilities located in the Soviet Union in territory controlled by what is now Russia or the Russian Federation ("Kazakh Stockpile").[6] While the suspension agreement was in effect, interested parties, including Plaintiffs and Defendant-Intervenors GOK and NUKEM, submitted comments to Commerce regarding the country of origin of the Kazakh Stockpile. Plaintiffs argued that the stockpile should be treated as subject to the Russian suspension agreement because it was enriched in Russian territory, while Defendant-Intervenors contended that it should be subject to the Kazakh suspension agreement because it was located in Kazakh territory at the time of the Soviet Union's dissolution. While not addressing the issue directly, Commerce authorized several shipments of uranium material from the Kazakh Stockpile into the U.S. during the pendency of the suspension agreement on condition that it be re-exported after processing in the United States.

In its *Final Determination*, the ITC excluded potential imports of uranium from the Kazakh Stockpile from its material injury analysis, following Commerce's pronouncement that enrichment confers origin, and reasoning that because the uranium in the Kazakh Stockpile was enriched in the Russian Federation, it was not a product of Kazakhstan for purposes of the determination. *See Final Determination* at 21.[7]

---

[6]*See* Subsection E of this section, *infra*, for a detailed explanation of the different types of uranium.

[7]Following the negative injury determination, Plaintiff USEC filed a request with Commerce for a scope ruling pursuant to 19 C.F.R. §351.225(d), asking for clarification that the Kazakh Stockpile was subject to the Russian Suspension Agreement. The DOC initiated a formal scope inquiry on this issue on October 12, 1999, and has not yet issued a Final Determination. *See Pls. USEC and United States Enrichment Corp.'s Mem. in Supp. of its Mot. for J. Upon the Agency R. ("USEC Br.")* at 11.

*C.     Cumulation*

On June 3, 1992, Commerce issued affirmative preliminary determinations that the uranium

imported from Kazakhstan, Kyrgyzstan, Russia, Turkmenistan, the Ukraine, and Uzbekistan was being

sold or was likely to be sold in the United States at LTFV.  *See Preliminary Determinations of Sales*

*at Less Than Fair Value: Uranium From Kazakhstan, Kyrgyzstan, Russia, Tajikistan, Ukraine*

*and Uzbekistan; and Preliminary Determinations of Sales at Not Less Than Fair Value; Uranium*

*From Armenia, Azerbaijan, Byelarus, Georgia, Moldava and Turkmenistan,* 57 Fed. Reg. 23380

(June 3, 1992).  Commerce terminated its investigations of the remaining six independent states because

they neither produced uranium nor made LTFV sales to the United States.  When Commerce entered

into the suspension agreement with Kazakhstan, it also signed suspension agreements with Kyrgyzstan,

Russia, Turkmenistan, the Ukraine, and Uzbekistan.

The pre-Uruguary Round Agreements Act ("URAA") cumulation provision of the antidumping

statute provides that the ITC must cumulatively assess the volume and effects of imports from two or

more countries of articles "subject to investigation" if the imports compete with one another and the like

product in the United States market.[8]  In its *Final Determination* regarding Kazakh uranium, the ITC

did not cumulate imports of uranium from Russian, Kyrgyzstan and Uzbekistan, reasoning that they were

still subject to suspension agreements and therefore not subject to ongoing investigations by either the

ITA or the ITC.

---

[8]19 U.S.C. § 1677 (7)(C)(iv)(l)(1993) provides:

> For purposes of clauses (i) and (ii) and subject to subclause (II), the Commission shall
> cumulatively assess the volume and effect of imports from two or more countries of like
> products subject to investigation if such imports compete with each other and with like products
> of the domestic industry in the United States market.

D.      *Related Parties*

Two domestic uranium producers, Cogema and Power Resources, Inc. ("PRI"), have parent companies with investments in the Kazakh uranium industry. Cogema S.A., which owns Cogema, has a 45 percent stake in a uranium deposit located in Kazakhstan and is partners with Kazatomprom, a GOK entity and a Defendant-Intervenor in this case. PRI's parent, Cameco Corp., owns a 60 percent share in a Kazakh uranium mining project, in which Kazatomprom is a partner. However, during the period of investigation ("POI"), neither Cogema's nor PRI's investments in Kazakh uranium resulted in the production, export or import of Kazakh uranium. Therefore in its final injury determination, the ITC found that Cogema and PRI were not related to Kazakh uranium producers or exporters within the meaning of the statute. *See Final Determination* at 10-11.

E.      *The Uranium Industry and Economic Models*

Uranium is a radioactive metal used as fuel in nuclear reactors. Before it can be used as fuel, it must pass through the four stages of the "uranium fuel cycle." During the first stage, uranium ore is mined and processed to increase the level of uranium oxide ($U_3O_8$) from between .1 percent and 15 percent to at least 70 percent. The resulting product is natural uranium concentrate, which represents approximately 25 percent of total nuclear fuel costs. The second state is conversion, in which the natural uranium is transformed into natural uranium hexaflouride ($UF_6$), which exists in powder form at room temperature and is transformed into gas when heated. Natural $UF_6$ contains a small amount of the isotope $U_{235}$, which is .71 percent by weight of natural uranium and is naturally fissionable. During the third state of the fuel cycle, the natural $UF_6$ is enriched to increase the percentage of $U_{235}$ to the level required by utilities for use in nuclear reactors. Enrichment requires vaporizing and processing the $UF_6$ until the percentage of $U_{235}$ reaches the level of three to five percent of the uranium by weight, and accounts for approximately 42 percent of total nuclear fuel costs. The fourth stage is fabrication, in which

the enriched $UF_6$ is transformed into uranium dioxide ($UO_2$) pellets and encased in fuel assembly rods for use by nuclear power plants. This process accounts for approximately thirty percent of total nuclear fuel costs.

Uranium is a fungible commodity product and interchangeable with uranium of the same form produced anywhere in the world. The commodity nature of uranium allows it to be traded almost exclusively based on price determined by the market. Most electric utilities in the U.S. enter into long-term contracts to purchase uranium. These contracts typically last from three to seven years or longer and account for 80 percent of the buyer's requirements. The prices paid under these contracts are closely linked to the market price for uranium both at the time of contract and delivery. The utilities purchase the remainder of their uranium needs on the spot market.

The profitability of the domestic uranium industry has been negatively affected by the increased competition in the industry. The world uranium market has an oversupply of uranium but maintains a flat level of consumption. This oversupply and lack of worldwide consumption increases the pressure on the domestic market. Uranium from former Soviet states is sold at a lower price than uranium produced in Western countries. During the POI, large quantities of uranium entered the domestic market in a variety of forms, causing the price of uranium and the level of U.S. production of uranium to fall. The Kazakh uranium imported during the POI consisted primarily of natural uranium, $U_3O_8$. However, the total sales value of uranium imported and sold in the United States during the POI was primarily attributable to forms of uranium that had undergone value-added processing. In its determination, the ITC compared future Kazakh imports to the total value of all domestic sales and non-subject imports of processed uranium, including that already met by pre-existing contracts. By this method, the Commission predicted

that Kazakh import prices would increase in the future based on the price trends when the Kazakh

suspension agreement was in effect, and would not cause material injury or threat of material injury to the

domestic market.

### III. STANDARD OF REVIEW

Plaintiffs ask the court to hold that the Commission's *Final Determination* is unlawful.  The

court must evaluate whether the finding in question is supported by substantial evidence on the record or

is otherwise in accordance with law.  *See* 19 U.S.C. § 1516a(b)(1)(B).  Substantial evidence is "[m]ore

than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Consolidated Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938)*;

Matsushita Elec. Indus. Co., Ltd. v. United States,* 750 F.2d 927, 933 (Fed. Cir. 1984).  This court

noted, "[i]n applying this standard, the court affirms [the agency's] factual determinations so long as they

are reasonable and supported by the record as a whole, even if there is some evidence that detracts

from the agency's conclusions." *Olympia Indus., Inc. v. United States*, 22 CIT ___, ___, 7 F.

Supp.2d 997, 1000 (1998) (citing *Atlantic Sugar, Ltd. v. United States*, 744 F. 2d 1556, 1563 (Fed.

Cir. 1984).

The court may not reweigh the evidence or substitute its own judgment for that of the agency.

*See Granges Metallverken AB v. United States*, 13 CIT 471, 474, 716 F. Supp. 17, 21 (1989).

Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing

two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from

being supported by substantial evidence." *Id.*, 13 CIT at 475, 716 F. Supp. at 21(citations omitted).

Additionally, absent a showing to the contrary, the agency is presumed to have considered all of the

evidence in the record.  *Nat'l Ass'n of Mirror Mfrs. v. United States*, 12 CIT 771, 779, 696 F. Supp.

642, 648 (1988).  Thus, "to prevail under the substantial evidence standard, a plaintiff must show either

that the Commission has made errors of law or that the Commission's factual findings are not supported

by substantial evidence." *Id*, 12 CIT at 774, 696 F. Supp. at 644.

## IV. DISCUSSION

Plaintiffs claim that the ITC's *Final Determination* is unsupported by substantial evidence and otherwise not in accordance with law. The court will address Plaintiffs' four principal arguments: (1) that the Commission unlawfully excluded the Kazakh Stockpile from its analysis of material injury or threat thereof; (2) that the Commission wrongly determined that imports of uranium from the Russian Federation, Uzbekistan and Kyrgyzstan were not subject to investigation and therefore not subject to cumulation under 19 U.S.C. § 1677(7)(C)(iv); (3) that the Commission wrongly determined that Cogema Inc. and Power Resources, Inc. are not related parties under 19 U.S.C. § 1677(4)(B); and (4) that the ITC incorrectly analyzed the present and likely future volume and price effects of the subject merchandise in making its determination, including evaluating the conditions without considering a certain economic model created by the U.S. Department of Energy.[9] With these arguments, Plaintiffs attempt to compensate for the fact that, by any measure, the subject merchandise at issue is a small quantity of uranium that the ITC reasonably determined would not cause material injury to the domestic industry.[10] For the reasons that follow, Plaintiffs' arguments fail, and the court denies Plaintiffs' *Motions for Judgment Upon the Agency Record.*

---

[9]Different economic models exist to predict the price, production, demand and supply of uranium on the market. The U.S. Department of Energy's Energy Information Administration ("EIA") bases its model, known as the Uranium Market Model ("UMM"), on future uranium demand that is not met by existing contracts. According to the UMM, the Kazakh imports will decrease the domestic uranium prices by $1.27 per pound, or 11 percent.

[10]*See Final Determination* at 27-28, stating that the volumes of imports of uranium from Kazakhstan "represented 2.0 percent of U.S. utilities' reactor requirements in 1996, 2.0 percent in 1997, and 1.3 percent in 1998," and that the volume and market penetration of nonsubject imports were between 10 and 90 times greater than those from Kazakhstan.

A.      *The Commission properly exercised its authority in excluding the Kazakh Stockpile from its material injury analysis; its determination is therefore in accordance with law.*

Plaintiffs contend that the ITC usurped Commerce's statutory authority to define the merchandise subject to investigation in an antidumping inquiry by interpreting Commerce's scope language to exclude the Kazakh Stockpile from its injury analysis.  They argue that by excluding the Kazakh Stockpile from its determination, the ITC exceeded its statutory authority under 19 U.S.C. § 1673d(b)(1), ignored substantial evidence that Commerce's scope definition did not address the issue of whether the Kazakh Stockpile was within the scope of the proceeding, and rendered a unilateral scope determination that unreasonably prejudiced the U.S. uranium industry's ability to seek relief.  *See Ad Hoc Br.* at 2.  Defendant responds that the ITC adhered to its statutory requirements and properly relied on the DOC's final determination, which unambiguously defined the imports subject to investigation.  *See Def. U.S. Int'l Trade Comm'n's Mem. in Opp. to Pls.' Mot. for J. on the Agency R. ("Def.'s Br")* at 13.

Initially, the court examines the statute to determine the extent of the ITC's authority.  Section 735 of the Tariff Act of 1930 requires the Commission to make a final determination of whether the domestic industry is injured or threatened with material injury "by reason of imports, or sales (or the likelihood of sales) for importation, of the merchandise with respect to which the administering authority has made an affirmative determination under subsection (a)(1) of this section." 19 U.S.C. § 1673d(b)(1).  The merchandise subject to investigation is the "class or kind of merchandise" as to which Commerce has initiated an antidumping investigation. 19 U.S.C. § 1673a(a)(1).  The antidumping statute defines "administrative authority" as "the Secretary of Commerce, or any other officer of the United States to whom the responsibility for carrying out the duties of the administrative authority under this subtitle are transferred by law."  19 U.S.C. §1677(l)(1994).  Thus, for purposes of the antidumping

statute, the phrase "administering authority" refers to the Department of Commerce. *See id*. While the ITA controls the scope of the investigation, the ITC determines whether material injury or the threat thereof to the domestic industry producing the like product exists. *See Ad Hoc Br.* at 16. No party to this litigation disputes that "the ITC does not look behind ITA's determination, but accepts ITA's determination as to which merchandise is in the class of merchandise sold at LTFV." *Algoma Steel Corp., Ltd. v. United States*, 12 CIT 518, 523, 688 F. Supp. 639, 644 (1988), *aff'd* 865 F.2d 240 (Fed. Cir. 1989), *cert. denied* 492 U.S. 919 (1989). No ambiguity exists in the statutory language defining the level of authority granted to the ITC.

Commerce did not specifically address in its Final LTFV determination whether the Kazakh Stockpile itself would be treated as subject merchandise. However, the ITA did state, "[t]he Department continues to regard enrichment of uranium as conferring origin." *Final LTFV Determination*, 64 Fed. Reg. at 31181. In its Final Determination, the ITC found that "the merchandise subject to investigation does not include enriched $UF_6$ and $UO_2$ currently located in Kazakhstan (the "Kazakh Stockpile")." *Final Determination* at 20. The ITC explains that Commerce's statement that enrichment of uranium confers origin, combined with the facts that Kazakhstan has no capacity for producing natural $UF_{65}$ or enriching $UF_6$, and that the uranium in the Kazakh Stockpile was enriched in the Russian Federation and then shipped to Kazakstan, led the Commission to follow the ITA's defined scope of the investigation. Noting that the Commission "considered the parties' arguments on this issue made before the Commission and Commerce and found that they did not identify any ambiguity that would allow us to go beyond the plain meaning of Commerce's scope definition," the ITC found that Commerce had excluded the Kazakh Stockpile from the scope of the investigation. *Final Determination* at 21, n. 97. As will be discussed *infra*, the court agrees with Defendant that the ITC properly exercised its authority in excluding the Kazakh Stockpile from its consideration of material injury by following the pronouncement of the ITA, the administering authority, that enrichment confers

origin.

Plaintiffs argue that the record evidence provided no reasonable basis for the Commission to conclude that Commerce had decided to exclude the Kazakh Stockpile from the scope of the investigation. *See Ad Hoc Br.* at 20. Moreover, Plaintiffs contend, the Commission ignored record evidence supporting a determination that the Kazakh Stockpile was within the scope of the investigation. *See USEC Br.* at 19. According to Plaintiffs, Commerce's intent to include the Kazakh Stockpile within the scope of the investigation is apparent from Commerce's approval of shipments for re-export from the Kazakh Stockpile under the provisions of the Kazakh Suspension Agreement. *See id.* at 21. Plaintiffs claim that the inclusion of the Kazakh Stockpile within the scope of the proceeding "was the only reasonable option to effectuate the statutory framework and protect the domestic industry's right to relief under the statute. When in doubt, the Commission must include 'questionable' material to be subject merchandise or risk frustrating the intended operation of the statute." *Ad. Hoc. Br.* at 21.

Plaintiffs are correct that the appropriate question for the court is not whether Plaintiff has the better argument regarding the origin of the material, but whether the Commission acted within its legal authority. *See USEC Br.* at 22. No ambiguity exists in the DOC's statement that enrichment of uranium confers origin. As such, the Kazakh Stockpile, which was enriched in Russia, was therefore excluded from the scope of the investigation of uranium from Kazakhstan. Evidence identified by Plaintiffs–that Commerce approved shipments from the stockpile for re-export during the 1996-1998 period, and that the DOC knew of the parties' arguments about the origin of the uranium in the Kazakh Stockpile, and that the absence of references to those arguments in its Final LTFV Determination proves that the DOC did not make a clear scope ruling–simply does not contradict the ITC's conclusion that the DOC did indeed identify the scope of the investigation. *See Def.'s Br.* at 9. Therefore, the ITC correctly followed

the direction of the ITA, and acted within its authority in conducting its investigation of material injury exclusive of the Kazakh Stockpile.

The court briefly addresses Plaintiffs claims that the exclusion of the Kazakh Stockpile changed the nature of the injury analysis and resulted in "profound consequences" for the domestic industry. Defendant is correct that Plaintiffs are not entitled to judicial review of the DOC's scope determination, but may only raise the issue of whether the ITC has correctly construed the scope determination from the ITA's statement that it "continues to regard enrichment of uranium as conferring origin." *Final LTFV Determination*, 64 Fed. Reg. at 31181. The court holds that the ITC properly exercised its legal authority in interpreting Commerce's LTFV Determination. The ITC's decision must be upheld as it is supported by substantial evidence, the ITA's pronouncement regarding enrichment, and is in accordance with the applicable law, Section 735 of the Tariff Act of 1930. 19 U.S.C. § 1673d(b)(1).[11]

B.      *The Commission's determination that imports covered by suspension agreements are not subject to investigation and therefore not subject to cumulation is in accordance with law.*

Plaintiffs assert that the ITC impermissibly construed 19 U.S.C. § 1677(7)(C)(iv) and unlawfully refused to cumulate imports of Kazakh uranium with imports from Kyrgyzstan, Russia and Uzbekistan in its material injury and threat of material injury analysis. Plaintiffs contend that although covered by suspension agreements, the imports were still subject to investigation and therefore should not have been excluded from the investigation. According to Plaintiffs, both the plain language of 19 U.S.C. §1677(7)(C) and Congressional intent require that imports under the Kyrgyzstan, Russia and Uzbekistan suspension agreements be found subject to investigation and cumulated with Kazakh imports. The ITC

---

[11]The court declines Plaintiff USEC's invitation, made during oral argument, to affirm or overturn the ITA's reasoning that enrichment confers origin. Such a determination is beyond the scope of judicial review in this case, as it is the ITC's final injury determination that is contested in this proceeding and not any action taken by the ITA.

responds that it correctly found that because these imports were covered by suspension agreements,

they were not subject to investigation and therefore did not meet the threshold requirement for

cumulation.

The pre-URAA cumulation provision requires the ITC to cumulatively assess the volume and

effects of imports from two or more countries of articles "subject to investigation" if the imports compete

with one another and with the like product in the United States.[12]  As previously noted, the subsection

states: "(iv): cumulation–For purposes of clauses (i) and (ii), the Commission shall cumulatively assess

the volume and effect of imports from two or more countries of like products subject to investigation if

such imports compete with each other and with like products of the domestic industry in the United

States market." 16 U.S.C. § 1677(7)(C)(iv).  Plaintiffs claim that the ITC has contravened the plain

language of the statute; however, Congress has given no specific  definition of the phrase "subject to

investigation," but has included language that guides the agency.  Indeed, as the Federal Circuit has

stated:

> To include imports in the cumulation equation, the statute requires they be "subject to
> investigation," "compete" with like products, and implies that they be marketed
> "reasonably coincidental" in time, but fails to define these terms, as to time or otherwise.
> Accordingly, the provision cannot be said to have a plain meaning.

*Chaparral Steel Co. v. United States*, 901 F.2d 1097, 1101 (Fed. Cir. 1990).

The ITC's determination is a reasonable interpretation of the statutory language.  As explained in

Defendant's brief, under the statute, acceptance of a suspension agreement prohibits the agency from

further investigating while the agreement is in effect.  The investigation may be resumed, but only

pursuant to requests made by eligible parties complying with specific conditions.  Defendant cites the

---

[12]The petition in this investigation was filed on January 1, 1995, prior to the amendments made in the Uruguay Round Agreements Act ("URAA").  The investigation was conducted pursuant to the statutory guidance as it existed at the time of the filing of the petition.  Therefore, it was not subject to the URAA provisions, and the court will heretofore cite to the statute as it existed prior to enactment of the URAA.

definition of suspension found in Black's Law Dictionary: "[a] temporary stop, a temporary delay, interruption or cessation." *Def.'s Br.* at 15. Thus, if an investigation is suspended, it is temporarily terminated. The ITC may reasonably interpret the "subject to investigation" provision to mean that imports covered by a suspension agreement in which investigation is temporarily terminated are not subject to investigation while under that agreement.

The ITC's refusal to cumulate is also in accord with the policies and legislative history behind the statute. Plaintiffs claim that the ITC's finding frustrates the central purpose of the cumulation provision–to adequately address simultaneous unfair imports from different countries. According to Plaintiffs, the ITC's interpretation allows respondents to "game" the system by entering into suspension agreements and then terminating the agreements consecutively rather than concurrently, and consequently avoiding cumulation. "Congress could not have intended to permit respondents to frustrate the purpose of the cumulation provision through such procedural manipulation." *Ad Hoc Br.* at 25. The court does not agree that the Commission's interpretation of the cumulation provision frustrates the purpose of the statute.

The legislative history does indicate that the cumulation provision was designed to "adequately address simultaneous unfair imports." *Chaparral Steel*, 901 F.2d at 1103 (quoting H.R. Rep. No. 725 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4910, 5164). Yet, this one statement of guidance in the legislative history of the cumulation provision alone does not conclusively forbid the ITC's refusal to cumulate in this situation. As Defendant correctly notes, the legislative history of suspension agreements and NME agreements "makes clear that they were intended as alternative remedies designed to dispose of antidumping cases in special circumstances." *Def.'s Br.* at 17. Under a suspension agreement, the exporters of a foreign government agree to modify their behavior to eliminate dumping or subsidization. *See* 19 C.F.R. § 351.208(a)(1999). In an NME agreement, Commerce suspends an antidumping

investigation on the basis of quantitative restraint agreements. The NME agreement, therefore, substitutes for an antidumping duty order.[13]  Imports covered by an antidumping duty order are not cumulated with imports under investigation.  As the Federal Circuit stated, "[t]he ITC construed the statutory scheme to require cumulation only of currently unfair imports, not those corrected by . . . the assessment of duties." *Chaparral Steel*, 901 F.2d at 1103.  The ITC's conclusion that Congress did not intend to require cumulation of imports subject to suspension agreements, including those with NME countries, is therefore in accord with *Chaparral Steel*.

Plaintiffs' claim that the ITC's practice allows importers to game the system by entering into suspension agreements to avoid cumulation ignores the other protective measures provided by the statute.  Before accepting an NME agreement, Commerce must be satisfied that such an agreement is in the public interest. *See* 19 U.S.C. § 1673c(a)(2)(B)(1993).  Additionally, if an agreement has been violated or is determined to no longer be in the public interest, Commerce may resume the investigation. *See* 19 U.S.C. §1673c(i), (l).  The regulations provide that if Commerce does not have sufficient information to make such a determination, it may invite comments and then make its determination. *See* 19 C.F.R. § 351.209(c). Additionally, the statute provides for civil penalties for intentional violations of suspension agreements. *See* 19 U.S.C. § 1673c(i)(2).  In view of these statutory and regulatory protections, the court agrees with Defendant that it is highly unlikely that NME countries would use such suspension agreements to "game" the system and avoid cumulation.  The Commission's interpretation of the "subject to investigation" provision of the statute is appropriate in light of the statute's text, legislative

---

[13]  Plaintiff Ad Hoc argues that NME agreements do not necessarily eliminate LTFV sales, and therefore imports subject to such agreements may still be traded unfairly. *See Pl. Ad Hoc Committee of Domestic Uranium Producers' Reply Br. to Def. and Def.-Intervenors' Mem. in Opp. to Pl.s' Mot. for J. on the Agency R. ("Ad Hoc Reply Br.")* at 7.  However, as discussed, the statute and regulations provide certain controlling safeguards for monitoring and canceling such agreements if necessary.

history and interpreting case law. Therefore, the court holds that the Commission's refusal to cumulate the Kazakh imports with those of Kyrgyzstan, the Russian Federation and Uzbekistan is in accordance with law.

C.       *The ITC's finding that Cogema, Inc. and Power Resources, Inc. were not related parties is supported by substantial evidence and in accordance with law.*

Plaintiffs claim that the ITC's failure to exclude Cogema, Inc. and Power Resources, Inc. ("PRI") from the domestic industry as related parties contravenes the statute. The ITC responds that it properly found no facts to conclude that either domestic producer was a related party for statutory purposes. *See Def.'s Br.* at 23. The court holds that the ITC's determination not to exclude the domestic producers as related parties is supported by substantial evidence and in accordance with law.

The related parties subsection provides: "[w]hen some producers are related to the exporters or importers, . . . the term 'industry' may be applied in appropriate circumstances by excluding such producers from those included in that industry." 19 U.S.C. § 1677(4)(B). In determining whether such parties are to be excluded, the ITC examines:

> (1) whether or not the domestic producers are themselves importers of the subject product or are related to the importers or foreign producers of such product through a corporate relationship; and (2) whether or not there are appropriate circumstances for excluding those domestic producers from the domestic industry for the injury analysis.

*Empire Plow Co. Inc. v. United States*, 11 CIT 847, 853, 675 F. Supp. 1348, 1353 (1987) (citations omitted).

In its *Final Determination*, the ITC held that "[n]either Cogema, Inc. nor PRI is related to the exporters or importers of LTFV merchandise, or is itself an importer of that subject merchandise." *Final Determination* at 10. Plaintiff Ad Hoc correctly notes that Cogema's parent company owns a 45

percent interest in the Moynkum deposit in Kazakhstan in partnership with Kazatomprom, and that Cameco, PRI's parent company, holds both a 60 percent interest in a joint venture with Kazatomprom, and a long-term contract with the Government of Kazakhstan for the exclusive marketing rights to any uncommitted Kazakh uranium production. *See Ad Hoc Br.* at 27-28. The ITC recognized these interests yet determined that because neither parent company actually produced or imported uranium ore during the investigation period, the two domestic companies were not excluded as related parties. *See Final Determination* at 10-11. Plaintiffs have therefore not demonstrated that the ITC's conclusion is unsupported by substantial evidence.

Moreoever, Plaintiffs have not shown that the ITC made legal errors in concluding that Cogema, Inc. and PRI were not related parties. Plaintiffs have demonstrated that the parent companies of each own interests in uranium ore deposits and mining projects. However, nothing in the text or legislative history of the statute indicates that such ownership mandates consideration as a related party. This court has previously noted that although little legislative history behind the related parties provision exists, the provision's purpose is to exclude from the industry headcount domestic producers substantially benefitting from their relationships with foreign exporters. Congress enacted the provision so that domestic producers whose interests in the imports were strong enough to cause them to act against the domestic industry would be excluded from the ITC's consideration and investigation into material injury or threat thereof. *See Empire Plow*, 11 CIT at 852, 675 F. Supp. at 1353.

The ITC's determination that a parent company's interest in Kazakh uranium is not sufficient to provide the necessary nexus to make these companies related parties accords with the statutory language and purpose. Therefore, the court upholds the ITC's decision not to exclude Cogema, Inc. and PRI as related parties.

D.      *The ITC's volume and price effects analyses are supported by substantial evidence on the record.*

In evaluating the effects of subject imports on the domestic market, the ITC must consider specific factors to determine whether the subject imports had, have, or will have a materially injurious effect on the domestic uranium market, including "the volume of subject imports, their effect on prices for the domestic like product, and their impact on domestic producers of the domestic like product, but only in the context of U.S. production operations." *Final Determination* at 13 (citing 19 U.S.C. § 1677(7)(B)(i)).  As the Commission correctly notes in its *Final Determination*, "No single factor is dispositive and all relevant factors are considered 'within the context of the business cycle and conditions of competition that are distinctive to the affected industry.'" *Id.* (quoting 19 U.S.C. § 1677(7)(c)(iii)).

Plaintiffs maintain that the ITC failed to properly assess the volume and price effects of the Kazakh uranium on the domestic market.  Plaintiffs' claims fail, because the ITC's analyses are supported by substantial evidence on the record as a whole.  The volume and price effect analyses are prescribed by 19 U.S.C. § 1677(7).  The ITC is required to determine whether the volume of the imports "either in absolute terms or relative to production or consumption in the United States, is significant." 19 U.S.C. § 1677(7)(C)(i).  Additionally, in evaluating price effects, the ITC must consider whether:

(I) there has been significant price underselling by the imported merchandise as compared with the price of like products of the United States, and

(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. §1677(7)(C)(ii).

The ITC is required to evaluate the effect of the subject imports on the domestic industry, which is defined by statute as "the domestic producers as a whole of a like product." 19 U.S.C. §

1677(4)(A).  First, the Commission determined the "like product" and  "domestic industry" in relation to

19 U.S.C. § 1677(4)(A).  The statute defines "like product" as "a product which is like, or in the

absence of like, most similar in characteristics and uses with, the article subject to an investigation. . . ."

19 U.S.C. §1677(10).  The Commission noted that the like product in this case consists of all four forms

of uranium–$U_3O_8$, unenriched $UF_6$, enriched $UF_6$ and unenriched $UO_2$.  *See Final Determination* at 7-

8.  Furthermore, the Commission, considering that the statute defines relevant industry as the "domestic

producers as a whole of a like product, or those producers whose collective output of the like product

constitutes a major proportion of the total domestic production of that product," included within the

domestic industry the concentrators, converter, enricher and fabricator.  19 U.S.C. § 1677(4)(A); *See*

*Final Determination* at 9-11.

In its determination of no material injury, the Commission listed seven conditions of competition

as relevant.  *See Final Determination*. at 16-20.  First, the Commission noted that the four forms of

uranium are commodity products and traded on a worldwide basis.  *Id.* at 16. Second, trade restrictions

and intergovernmental agreements limit exports of uranium from the successor countries to the former

Soviet Union, the Newly Independent States ("NIS") into the United States. *Id.*  Third, all imports into

the United States of nonsubject $U_3O_8$, from countries other than the NIS, were more than [     ]

Kazakhstan's total anticipated $U_3O_8$ production capacity for 1999.  *Id.* at 18.  Fourth, although there

exists a large overhang of natural and enriched $UF_6$ in the United States, the United States Government's

commitment in March 1999 to withhold the uranium from the marketplace may lessen its effect on

prices.  *Id.* at 19.  Fifth, companies holding the uranium in the United States may engage in non-cash

transactions, such as exchanging equivalent quantities of uranium to avoid transportation costs or

government restrictions, and [

] . *Id.* These transactions can result in the disaggregation of an advanced stage of

uranium into the raw material and processing, which creates separate markets for uranium and enrichment components of enriched $UF_6$. *Id.* at 19-20. Sixth, deregulation of electrical utilities in the United States has put nuclear power plants into competition with other electrical sources, resulting in pressure on the nuclear facilities to cut costs by obtaining price reductions from traditional suppliers. *Id.* at 20. Seventh, the demand for uranium in the United States is expected to remain steady or decrease slightly in the near future. *Id.*

Plaintiffs assert that the Commission should have considered alternative and additional factors in making its determination; namely, the commodity nature of uranium, the uncommitted demand outside of long-term contracts, and the fact that Kazakstan's uranium is primarily $U_3O_8$ concentrate. The court will discuss each of Plaintiffs' arguments in turn.

First, Plaintiffs claim that the Commission wrongly failed to take the commodity nature of uranium into account, and departed from past practice in this area without explaining its departure. Uranium is a fungible commodity product; therefore, even a small amount of the import may significantly impact the domestic market. Because any form of uranium is essentially interchangeable with the same form from anywhere else in the world, it is traded almost exclusively based on price. *See Ad Hoc Br.* at 30-31. Plaintiffs claim that the ITC failed to appropriately consider the implications of the commodity nature of uranium in its analysis of past and future effects of Kazakh imports on the United States market. *Id.* at 32. According to Plaintiffs, the failure of the ITC to appropriately consider these effects contravened the statutory requirement that the ITC consider distinct conditions of competition. Furthermore, Plaintiffs claim that this failure to take into account uranium's commodity nature contravened the ITC's requirement to either conform to past practice or explain its reasoning for departing from past practice.

Defendant responds that the ITC did take into account evidence of the commodity nature of

uranium, but did not find all uranium products to be fungible. *See Def.'s Br.* at 31. The ITC found that each form of uranium was a commodity product, and that there was some competition among forms of uranium, and that subject imports of one form competed more directly with domestic uranium of the same form, rather than with uranium of other forms. *Id.* From this evidence, the Commission concluded that imports of one form of uranium had less of an impact on the entire uranium market than would normally be expected for a commodity product.

Plaintiffs have not shown the court that the way in which the ITC considered the commodity nature of uranium was an error of law or resulted in a factual finding unsupported by substantial evidence. The ITC did recognize that the fungible commodity nature of uranium is a condition of competition relevant to its analysis of material injury. Yet, the Commission was not required to give more consideration than it did to the commodity nature of uranium, or reach a different result on this basis. As Defendant states, the ITC may find that low volumes do not have significant price effects, provided that it explains in the determination why price effects were unlikely despite the commodity nature of the product. *See U.S.X. v. United States*, 12 CIT 844, 848-49, 698 F. Supp. 234, 238-39 (1988). In this instance, the Commission discussed seven conditions of competition, explaining why price effects were unlikely, despite the commodity nature of uranium *See Final Determination* at 16-20; *supra* 21-22. The Commission failed to reach Plaintiffs' desired result; however, the ITC did properly and adequately consider the commodity nature of uranium as a condition of competition.

In the investigation of *Uranium from Tajikistan and Ukraine*, the ITC found that "uranium is a highly fungible commodity" and that "even small volumes of LTFV imports will likely exacerbate the oversupply of uranium and have depressing and suppressing effect on domestic prices." *Uranium From Tajikistan and Ukraine*, Inv. Nos. 731-TA-539-D & 539-E (Final), USITC Pub. 2669 at 33 (Aug. 1993). Plaintiffs assert that in the investigation of Tajik and Ukrainian uranium, the ITC established a

practice of taking the commodity nature of uranium into account in the volume effects analysis, from which it unlawfully departed without explanation in its investigation of uranium from Kazakhstan.  In support of its claim, Plaintiffs cite *Citrosuco Paulista, S.A. v. United States,* in which this court noted, "it is also a general rule that an agency must either conform itself to its prior decisions or explain the reasons for its departure." 12 CIT 1196, 1209, 704 F. Supp. 1075, 1088 (1988) (citations omitted).

Defendant recognizes the general rule, but notes that the ITC need not follow prior decisions if new arguments or facts support a different conclusion. *See id.*  Defendant cites *U.S. Steel Group v. United States*, for the proposition that

> The court has long recognized that "each injury investigation is *sui generis*, involving a unique combination and interaction of many economic variables; and consequently, a particular circumstance in a prior investigation cannot be regarded by the Commission as dispositive of the determination in a later investigation."

19 CIT 1190, 1213, 873 F. Supp. 673, 695 (1994) (quoting *Connecticut Steel Corp. v. United States*, 18 CIT 313, 318, 852 F. Supp. 1061, 1066 (1994)).  Defendant goes on to note that in its *Final Determination*, the Commission lists several reasons for departing from its analysis in *Uranium from Tajikistan and Ukraine*. *See Def.'s Br.* at 33-34.  Essentially, the market segmentation analysis employed in the prior investigation would not be useful in the investigation of uranium from Kazakhstan, as the uranium market had changed substantially since the investigation of Tajik and Ukrainian uranium in 1993.  *See Final Determination* at 30.  The ITC noted several changes to the United States uranium market: a "great influx" of Russian-enriched $UF_6$ pursuant to the Russian HEU agreement, and larger inventories of $U_3O_2$ and natural $UF_6$ in the United States due to the abundance of enriched $UF_6$.[14]  *See*

---

[14]In 1994, Plaintiff USEC and an Executive Agent for the Russian Federation signed a commercial agreement (the "Russian HEU Agreement") under which USEC anticipated purchasing up to 92 million separative work units ("SWU") of uranium over a 20 year period.  Pursuant to the HEU Contract, USEC ordered 4.4 million SWU in 1998, 5.5 SWU for 1999, and has committed to order up to 5.5 million SWU in both 2000 and 2001.

*id.* at 30-31. Plaintiffs' argument on this point fails as the ITC has offered several reasonable explanations for the agency's decision to depart from the volume and pricing analysis in *Uranium From Tajikistan and Ukraine*.

Plaintiffs then argue that the Commission unlawfully compared the volume of potential future Kazakh imports to the total volume of domestic utilities' projected uranium requirements, rather than to future uncommitted demand. *See Ad Hoc Br.* at 34. As indicated, the majority of uranium is purchased through long-term contracts that last from three to seven years, and future consumption met by these contracts is no longer subject to competition between domestic producers and importers. *Id.* at 33. Any remaining uranium demand is satisfied through purchases on the open market, and the Commission determined that Kazakh uranium is generally sold on the spot market in the United States. *See Final Determination* at 29. Therefore, according to Plaintiffs, "simply examining projected future uranium *consumption* does not accurately indicate the size of future market *demand* in the imminent future." *Ad Hoc Br.* at 33. Rather, the existence of long term contracts, and the fact that Kazakh imports are typically sold into the spot market, should have led the ITC to compare future subject imports with future uncommitted demand. *See id.* at 33-34. Plaintiffs attempt to buttress their argument by stating that the U.S. Department of Energy's Energy Information Administration ("EIA") uses uncommitted demand to predict prices and production, and that the ITC relied upon uncommitted domestic demand in its determination of material injury in *Uranium from Tajikistan and Ukraine*. *Id.*

Defendant first responds that the ITC is required to determine the effects of subject imports on the industry as a whole, not only that section of the market in which imports are concentrated. *See Def.'s Br.* at 27 (citing *Saarstahl AG v. United States*, 18 CIT 595, 601-02, 858 F. Supp. 196, 201 (1994) (holding that the Commission reasonably interpreted the statute as requiring it to assess the

condition of the industry as a whole.)).  Moreover, in light of Plaintiffs' argument before the ITC that spot market sales affect sales under long-term contracts, the ITC properly compared subject imports to the entire domestic uranium market.  *Id* at 27-28.  Second, Defendant counters that measuring open market demand is highly speculative and fraught with inaccuracy.  *Id.* at 28.  The speculative nature of measuring the spot market is indicated by the significant discrepancies in each Plaintiff's projections of the potential open market share of Kazakh imports.

Plaintiffs state that the ITC's obligation to consider "any rapid increase in United States market penetration and the likelihood that the penetration will increase to an injurious level," indicates that the ITC was required to look to open demand as the correct measure of the uranium market, because the spot market is the relevant market where prices are set. *See Pl. USEC Reply Mem. in Supp. of its Mot. for J. Upon the Agency R.* ("*USEC Reply Br.*") at 18-19.  However, the statutory language does not require the ITC to measure subject imports against the open market, and Plaintiffs have not shown that the ITC's determination to measure the subject imports against the entire domestic industry is unsupported by substantial evidence.

Plaintiffs argue that the Commission unlawfully compared the value of Kazakh imports to the total value of all forms of uranium sold and imported into the United States during the POI.  *See Ad Hoc Br.* at 35.  Specifically, because Kazakh uranium imports consisted of natural uranium, $U_3O_8$ concentrate, the Commission should have measured the imports only against domestic $U_3O_8$, rather than against all forms of uranium.  In its defense, the ITC notes that while in certain appropriate circumstances, the agency may conduct a segmented analysis, no such requirement exists.  *See Encon Industries, Inc. v. United States*, 16 CIT 840, 842 (1992) ("Analysis by producers or on a market segment basis is not required.").  Despite the ITC's decision not to segment the market by $U_3O_8$ concentrate, the agency did conduct an analysis of market scenarios limited to the $U_3O_8$ concentrate

segment of the market. The ITC projected the production, the export level and the penetration of the domestic market by Kazakh uranium. *See Def.'s Br.* at 26- 27, (citing *Final Determination* at 37). Upon evaluation of such scenarios the ITC concluded that the domestic industry would not be materially injured. Once again, Plaintiffs have cited no record evidence indicating that the Commission's determination was unreasonable. As it is supported by caselaw as well as substantial evidence on the record, the ITC's determination not to segment the analysis is reasonable.

Lastly, Plaintiffs assert that the ITC's *Final Determination* is not legally sustainable because not only did the ITC fail to properly use the UMM to evaluate the uranium market, the ITC failed to explain this decision. Both aspects of Plaintiff's arguments are without merit. The UMM is an economic model that evaluates only a small portion of the uranium industry. The UMM projections about the U.S. uranium industry are limited to the uncommitted demand for the $U_3O_8$ concentrate segment of the market. As discussed *supra*, the ITC, with proper record support, determined that this segment of the market is insufficient in making a Final Injury Determination. The ITC's valid explanation for not segmenting the market as advocated by Plaintiffs applies as well to the ITC's choice not to use the UMM. The ITC is not required to explain its use, or lack thereof, of economic models. Congress, in recognizing the complexity of antidumping determinations, required the ITC only to discuss "material issues of law or fact" central to the *Final Determination*. *Jeannette Sheet Glass Corp. v. United States*, 9 CIT 154, 161, 607 F. Supp. 123, 130 (1985). Due to the ITC's reasonable conclusion under the statute, 19 U.S.C. §1677(4)(A), that the uranium market should be examined as a whole, the UMM was not of "material issue" in making the *Final Determination* and not required to be discussed by the ITC.

The court holds that the Commission's findings regarding the price and volume effects of

the imported Kazakh uranium on the domestic uranium market are supported by substantial evidence on the record and are in accordance with law.  Although the complexities of the uranium industry may allow for analysis of different models, projections and market segmentations, the ITC's evaluation is supported by the facts and the law.

### V. CONCLUSION

For the foregoing reasons, the court holds that the ITC's *Final Determination* in *Uranium From Kazakhstan*, USITC Pub. 3213, Inv. No. 731-TA-539-A (Final) (July 1999) is supported by substantial evidence and in accordance with law.  Therefore, the court denies Plaintiffs' *Motions for Judgment Upon the Agency Record.*  Judgment will be entered accordingly.

Dated: _____                                    _____
       New York, NY                                                              Judith M. Barzilay
                                                                    Judge