**Slip Op. 01-103**

# UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                                          :
AD HOC COMMITTEE OF DOMESTIC              :
URANIUM PRODUCERS,                        :
                                          :
           Plaintiff,                     :  Court No. 00-09-00450
                                          :
               v.                         :
                                          :
THE UNITED STATES,                        :
                                          :
           Defendant,                     :
                                          :
           and                            :
                                          :
GOVERNMENT OF UZBEKISTAN and NAVOI        :
MINING AND METALLURGICAL COMBINAT,        :
                                          :
           Defendant-Intervenors.         :
_____ :
```

[ITC determination sustained.]

Dated:  August 14, 2001


Akin, Gump, Strauss, Hauer & Feld (Valerie A. Slater, Stephen J. Claeys and Catherine J. Finnegan) for plaintiff.

Lyn M. Schlitt, General Counsel, James M. Lyons, Deputy General Counsel, Office of the General Counsel, United States International Trade Commission (Robin L. Turner) for defendant.

White & Case, LLP (Carolyn B. Lamm and Adams C. Lee) for defendant-intervenor.

## OPINION

**RESTANI, Judge:**  This matter is before the court on the motion of plaintiff Ad Hoc Committee of Domestic Uranium Producers under United States Court of International Trade ("C.I.T.") Rule 56.2 for judgment upon the administrative record

before the International Trade Commission ("Commission" or "ITC"). Plaintiff challenges the negative results as to Uzbekistan in the sunset review determination found in <u>Uranium from Russia, Ukraine and Uzbekistan</u>, USITC Pub. 3334, Inv. Nos. 731-TA-539-C, E and F (Review) (Aug. 2000) [hereinafter "<u>Final Determination</u>"]. Plaintiff challenges the decision of the Commission not to cumulate imports from at least two of the three countries under review. It also challenges the Commission's determination that the volume of Uzbek imports would not rise to a significant level if the restraints resulting from the antidumping duty petition were removed.

## Facts

Uzbek imports are subject to a suspension agreement which has been modified several times. <u>See</u>, <u>e.g.</u>, <u>Uranium from Kazakhstan, Russia, Tajikistan, Ukraine, and Uzbekistan</u>, 57 Fed. Reg. 49,220, 49,255-61 (Dep't Comm. 1992) (suspension of invest.) [hereinafter "<u>Suspension Agreement</u>"]; <u>Agreement Suspending the Antidumping Investigation on Uranium from Uzbekistan</u>, 60 Fed. Reg. 55,004 (Dep't Comm. 1995) (amended susp. agreement). The challenged sunset review is pursuant to 19 U.S.C. § 1675(c)(1)(c), which requires review five years after publication of such a suspension agreement to determine if termination of the agreement "would be likely to lead to

continuation or recurrence of dumping . . . and of material injury."

The ITC by a vote of 5-0 determined that termination of the suspended investigation covering uranium from Uzbekistan would not be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time.[1]  See Final Determination, at 44.  The ITC also unanimously exercised its discretion not to cumulate Russian and Uzbek subject imports.  See id. at 19-24, 49-53.

With regard to cumulation, the ITC first found that the statutory requirement that all reviews be initiated on the same day was satisfied.  Id. at 20-21.  The ITC also did not find that Russian and Uzbek subject imports would be likely to have no discernible adverse impact on the domestic industry.[2]  Id. at 21-22.  A contrary conclusion by the ITC would have ended the inquiry.  See 19 U.S.C. § 1675a(a)(7) ("The Commission shall not

---

[1]  Vice Chairman Deanna Tanner Okun did not participate.  See Final Determination, at 3 n.2.  The ITC also by a vote of 5-0 made an affirmative determination regarding the suspended investigation covering uranium from Russia, and a negative determination covering the antidumping order covering uranium from Ukraine.  See id. at 40, 45.  These decisions are not challenged.

[2]  The discernible adverse impact finding was unanimous with regard to Russian imports, see Final Determination, at 21-22, 48-49, 51, whereas Commissioner Bragg disagreed with the conclusions of the remaining commissioners regarding the likely impact of Uzbek imports.  See id. at 21-22, 49-52.

cumulatively assess the volume and effects of imports of the subject merchandise in a case in which it determines that such imports are likely to have no discernible adverse impact on the domestic industry."). Rather, the ITC considered whether to exercise its discretion to cumulate such imports. The ITC majority in two separate views found that Russian and Uzbek subject imports would likely not compete under similar conditions of competition, if the suspended investigations were terminated, and declined to exercise its discretion to cumulate Russian and Uzbek subject imports in these reviews. See Final Determination, at 22-24, 52-53.

The ITC found several conditions of competition in the uranium industry relevant to its determinations in this review. First, the ITC found that various forms of uranium – uranium concentrate ($U_3O_8$), natural uranium (natural $UF_6$), enriched uranium (enriched $UF_6$), and uranium oxides ($UO_2$)– are individually fungible, commodity products and, for the most part, substitutable with uranium of the same form produced elsewhere in the world. Id. at 28. However, the four forms are not physically interchangeable with each other since they are all intermediate products each successively contained in one another.[3] Id.

---

[3]     The traditional four-stage production process, known as the
                                                      (continued...)

Second, the ITC found that there have been substantial structural changes to the domestic industry since the original investigations, including consolidations and closings of U.S. uranium concentrate and conversion operations. Id. The most significant change, however, has been the privatization of USEC,[4] the only U.S. enricher of uranium. Id. at 28-29. USEC traditionally has enriched natural $UF_6$ to produce LEU for electric utilities, but, as the U.S. Government's Executive Agent for the Russian HEU Agreement, USEC is required to import large

---

[3] (...continued)
"uranium fuel cycle," proceeds as follows: In the first stage, "concentrators" mine uranium ore and extract the uranium in a concentrated form of $U_3O_8$, resulting in a product known as "uranium concentrate." In the second stage, "converters" transform the uranium concentrate into natural uranium hexafluoride (natural $UF_6$). In the third stage, the "enricher" vaporizes the natural $UF_6$ and processes it using units of effort called "separative work units" ("SWU") to increase the percentage of $U^{235}$, thereby producing enriched uranium hexafluoride (enriched $UF_6$). Enriched $UF_6$ is processed for use in nuclear power plants to a proportion of $U^{235}$ in the uranium from 0.71 percent to 3-5 percent by weight (low-enriched uranium or LEU) and for use in nuclear weapons and nuclear propulsion to a proportion of $U^{235}$ in uranium of 20 percent or more (highly-enriched uranium or HEU). In the fourth and final stage, "fabricators" convert the "enriched $UF_6$" into uranium dioxide ($UO_2$), which they then pelletize and encase the pellets into protective metal sheaths, called fuel assembly rods, to meet the needs of specific nuclear power plants. While the $UO_2$ in powder or pellet form is part of the subject merchandise, the fuel assembly rods are not.

[4] Created by the U.S. Government in 1992 as the first step toward the privatization of the Department of Energy's uranium enrichment activities, USEC was fully divested of Government ownership and became a publicly-held corporation in July 1998. Final Determination, at 29.

quantities of Russian LEU blended down from Russian HEU and sell it directly to utilities.  Id. at 29.

Third, the ITC found that U.S. utilities' demand for uranium, as measured by reactor requirements, has been constant during the review period and is projected to remain relatively flat for the next decade.  Id.  Uranium consumption has been affected by the closure of at least 11 U.S. nuclear power plants in the past 20 years and no new plant construction.  Id.  Demand for uranium also has been affected by deregulation of electrical utilities, which effectively puts nuclear power plants in competition with other sources of electricity and increases pressure on the utilities to cut costs by obtaining uranium at the lowest cost whether through the traditional fuel cycle or from non-traditional uranium suppliers.  Id.  The ITC noted that the nature of U.S. demand may be changing as U.S. electric utilities are now able to purchase more advanced products directly, especially natural $UF_6$ and enriched $UF_6$, whereas in the past they typically were limited to purchasing the uranium concentrate and contracting for toll production at each of the subsequent stages of processing.  Id.  While long-term contracts account for a majority of  utilities' purchases,  the increased availability of more advanced products has led to shorter lead times and allowed a reduction in long-term purchases in favor of shorter-term contracts, including spot contracts.  Id.

Fourth, another significant condition of competition is the overall increase in the supply of uranium, and, in particular, the increased availability of uranium in processed forms. Id. at 29-30. Imports under the Russian HEU Agreement have provided a large and increasing supply of uranium at the LEU stage to the U.S. market. Id. at 30. Moreover, the Russian feedstock (natural $UF_6$) also is available for sale in the U.S. market at annual limits that increase to an annual total of 20 million pounds in 2007. Id. Increased worldwide availability of uranium, particularly in processed form, as well as cost-cutting measures resulting from deregulation, have led some utilities to sell or trade uranium from their inventories on the open market, adding to the number of suppliers and the already existing excess supplies. Id. at 31. The development of the relatively high-grade, low-cost uranium ore reserves in Canada and Australia have added to the worldwide uranium abundance, and have been an increasing supply of uranium concentrate to the U.S. market during the review period. Id. at 30-31.

Fifth, the ITC found that the inventories, which are typically stored by producers but owned by utilities, created separate, but interrelated, markets through swaps and loans for the uranium and enrichment components of enriched $UF_6$. Id. at 31. Finally, the ITC found that trade restrictions in the United States and Europe affected exports of uranium from the successor

countries to the former Soviet Union and resulted in a two-tier pricing structure.[5]  Id. at 31-32.

The ITC concluded, based on the facts in the record of the Uzbek review, that "while there may be some increase in the volume of subject imports of uranium from Uzbekistan if the suspended investigation is terminated, it is not likely to reach significant levels within a reasonably foreseeable time."  Id. at 43.  The ITC considered the volume of subject imports in absolute terms and relative to consumption of all uranium and only uranium concentrate, imports and U.S. utilities's reactor requirements. Id. at 41-43.  The ITC found that Uzbek imports of uranium concentrate represented a relatively small share of total U.S. uranium sales and imports of all uranium during the period of review.  Id. at 41.  Relevant confidential information is found at Final Staff Report, at IV-7, C.R. Doc. 46, ITC App., Tab 6, at IV-7; Uzbekistan Pre-Hearing Br., at 20-21, Exh. 7, C.R. Doc. 16, ITC App., Tab 3, at 5-6, 8; Post-Hearing Br., at 3, C.R. Doc. 32, ITC App., Tab 5, at 2.[6]

---

[5]  While the other related suspension agreements limited the volume of uranium that the countries could sell into the United States, the Uzbek suspension agreement imposed numerical quotas, with the quota being increased if the price of uranium in the United States increased.  See Suspension Agreement, 57 Fed. Reg. at 49,255-56, 49,260.

[6]  Documents contained in List 1 of the Administrative Record are identified as "P.R. Doc. __," and documents contained in List
(continued...)

Capacity utilization was particularly high.  The ITC recognized that since imports of Uzbek uranium have been subject to quotas, which generally have been fully subscribed, it is likely that uranium shipments from Uzbekistan may increase to some degree without the Suspension Agreement quotas.  <u>Final Determination</u>, at 42.  However, the ITC found that even if 100 percent of Uzbek's production capabilities were utilized and all such product were shipped only to the U.S. market, the volume of Uzbek imports would still not rise to a significant or injurious level.  <u>Id.</u> at 43.

Based in large part upon its finding that the likely volume of Uzbek imports will not be significant, the ITC also found that, in the event of termination of the suspended investigation, it is unlikely that Uzbek subject imports would result in significant adverse price effects in the U.S. market.  <u>Id.</u>  While the ITC found that the U.S. uranium industry was in a vulnerable condition, it concluded that in the absence of significant volume changes or price effects, it is not likely that termination of the suspended Uzbek investigation will result in a significant adverse impact on the domestic industry.  <u>Id.</u> at 44.  Therefore, the ITC determined that termination of the suspended investigation on uranium from Uzbekistan is not likely to lead to

---

[6] (...continued)
2 of the Administrative Record are identified as "C.R. Doc. __."

the continuation or recurrence of material injury to the domestic

industry within a reasonably foreseeable time.

### Discussion

**A.  The Commission did not abuse its discretion
     as to cumulation.**

Cumulative assessment of imports from different countries

under simultaneously initiated reviews is not mandatory in sunset

reviews, even if such imports compete with each other and the

domestic like product to some degree.  Contrast 19 U.S.C.

§ 1675a(a)(7) ("the Commission may cumulatively assess the volume

and effect of imports . . .") with 19 U.S.C. § 1677(7)(G)

(setting forth conditions in original title VII material injury

investigation under which the Commission "shall" cumulate).[7]  See

also Statement of Administrative Action, accompanying H.R. Rep.

No. 103-826(I), at 887, reprinted in 1994 U.S.C.C.A.N. 4040,

4212; Eveready Battery Co. v. United States, 77 F. Supp. 2d 1327,

1331 (Ct. Int'l Trade 1999) (cumulation in sunset reviews is

discretionary).

Unlike present material injury investigations, both threat

of injury investigations and sunset reviews require the

Commission to assess the likelihood of future injury, and

cumulation is not mandated in either type of proceeding.  Compare

---

[7]   The prohibition contained in 19 U.S.C. § 1675a(a)(7) against
cumulation of imports with no discernable adverse impact on the
domestic industry is not at issue.

19 U.S.C.  1675a(a)(7) (discretionary cumulation for sunset reviews) with 19 U.S.C. § 1677(7)(H) (cumulation to the extent practical for threat of material injury criteria).  Both types of proceedings are inherently prospective and the Commission attempts to predict the future based on current data and historical trends, if possible.  Combining trends has proved difficult in threat investigations, and the court has upheld Commission determinations not to cumulate under such conditions.  See, e.g., Kern Liebers USA v. United States, 19 CIT 87, 103-04 (1995); Torrington Co. v. United States, 16 CIT 220, 229-30, 790 F. Supp. 1161, 1171-72 (1992).

In this case, both countries' exports were subject to suspension agreements, and Russian imports are subject to the terms of the outstanding HEU agreement, which is not dependent on the continuation of the antidumping duty regime.  See Final Staff Report, at I-13, ITC App., Tab 6, at I-13.  It would be difficult, therefore, to make any meaningful predictions based on combining past Russian and Uzbek import volume, market share, and price effects data, as plaintiff concedes.  See Pl.'s Reply Br. at 9 n.4.

Accordingly, the Commission considered what it expected the conditions of competition to be for imports from the respective countries.  The Commission considered the large share of the HEU market guaranteed to Russian imports.  Id. at 23.  It also

considered the full range of market segments served by Russian imports and the narrow market segment of unprocessed uranium served by Uzbek imports.  Id. at 23-24.  Plaintiff does not dispute these facts.  The Commission also did not deny the fact of some competition.  Id. at 23.  It simply found insufficiently similar conditions of competition to warrant cumulation.  Id. at 23-24.  This is more than sufficient reasoning to justify a decision not to cumulate in a sunset review.

Plaintiff's other arguments are insufficient to show error on the Commission's part in this regard.[8]  The Commission may consider market segmentation in assessing conditions of competition even when there is one like product.  Ranchers-Cattleman Action Legal Foundation v. United States, 74 F. Supp. 2d 1353, 1371-2 (Ct. Int'l Trade 1999).

**B.    The Commission's decision that Uzbek imports were unlikely to reach significant levels was supported.**

The basic inquiry in a sunset review is whether termination of whatever unfair trade discipline has been imposed will likely lead to the material injury to the domestic industry sought to be avoided by the discipline imposed.  19 U.S.C. § 1675a(a)(1).  To this end the likely volume, price effects, and impact of the

---

[8]    The court need not reach the issue of whether the significance of different production capacities and inventories was adequately explained, as it finds the other factors cited by the Commission adequate to support its decision.

imports are considered. Id. Volume is considered in absolute terms and relative to production or consumption in the United States. 19 U.S.C. § 1675a(a)(2). In this case volume was considered in relation to U.S. consumption of all uranium and also in relation to only uranium concentrate, as well as the large volume and market share of non-subject imports. Final Determination, at 41 & nn. 241-42. Uzbek imports were projected to increase as a result of termination of the suspension agreement, but the Commission also considered the very high Uzbek capacity utilization, low inventories and the lack of significant projected increase in production capacity, id. at 42-43, each of which it is required to consider under § 1675(a)(2).

Uzbek uranium, for which there is no home market, is largely sold under long-term contracts and there was no evidence that significant shifting to U.S. markets would occur. Final Determination, at 42-43. Nonetheless, as indicated, the Commission considered the possibility of total capacity utilization and total diversion to the U.S. market. It still failed to find significant volume. Id. at 43.

Plaintiff's chief objection is to the Commission's decision, in the face of long term contracts, not to measure the likely volume of imports relative to future uncommitted demand. This argument was rejected in USEC, Inc. v. United States, 132 F. Supp. 2d 1, 15-16 (Ct. Int'l Trade 2001). Whatever the factual

differences between that case and the one at hand, the principle that volume need not be assessed relative to uncommitted demand only is a good one. What percentage of Uzbek volumes would one measure against uncommitted demand? How long should the contract term be before the covered volume is removed from consideration? Given that the spot market is relatively small, why should that market dictate the outcome? Whatever merits plaintiff's position has, it also has problems, as these questions indicate. No methodology is perfect. Neither the statute nor the facts of this case compel the Commission to use plaintiff's proposed methodology.

Finally, plaintiff argues that the Commission failed to measure volume against U.S. production. The statute directs that the ITC "shall consider whether the likely volume of imports . . . would be significant . . . either in absolute terms or relative to production or consumption in the United States." 19 U.S.C. § 1675a(a)(2). Assuming arguendo that this issue was not waived, plaintiff is correct that the Commission may not ignore its statutory mandate to evaluate the possible significance of subject import volumes relative to U.S. production. Notwithstanding this oversight on the part of the Commission, remand is unnecessary because the court does not find that the ITC would have arrived at a different conclusion regarding the impact of subject import volumes. See NLRB v. Wyman-Gordon Co.,

394 U.S. 759, 766 n.6 (1969) (refusing to remand despite agency error of law where remand would be an "idle and useless formality"); Illinois v. ICC, 722 F.2d 1341, 1348-49 (7th Cir. 1984) (refusing to remand despite agency error of law because agency would not have arrived at a different conclusion); NLRB v. American Geri-Care, Inc., 697 F.2d 56, 64 (2d Cir. 1982) (same). Where nonsubject imports are an important factor, assessment in terms of U.S. production is not likely to be useful. Cf. Gerald Metals, Inc. v. United States, 132 F.3d 716, 722-23 (Fed. Cir. 1997) (in finding wrong standard of injury applied, court notes effects of nonsubject imports must be considered by Commission). In such cases, measurement of subject import volumes against U.S. consumption likely will give a clearer picture of the significance of subject import volumes. Under the facts of this case, particularly the prominence of nonsubject imports, see Final Determination, at 30-31, there is no point to assessment of subject import volumes relative to U.S. production at this stage, as assessment against such a limited factor will not reveal the significance of the imports in a market heavily affected by non-U.S. products. None of plaintiff's subsidiary arguments undermine the Commission's determination.

In sum, this does not appear to be a close case and the Commission's unanimous result is sustained.


                                  _____
                                       Jane A. Restani
                                         JUDGE


Dated:  New York, New York

       This 14th day of August, 2001.