**Slip Op. 02-153**

# UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE:  RICHARD K. EATON, JUDGE**

|  |  |  |
|---|---|---|
| | : | |
| **NIPPON STEEL CORP., KAWASAKI STEEL** | : | |
| **CORP., THYSSENKRUPP ACCIAI** | : | |
| **SPECIALI TERNI S.p.A. and ACCIAI** | : | |
| **SPECIALI TERNI USA, INC.**, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | **Consol. Court No. 01-00103** |
| | : | |
| **UNITED STATES**, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| **ALLEGHENY LUDLUM CORP., AK STEEL** | : | |
| **CORP., BUTLER ARMCO INDEPENDENT** | : | |
| **UNION, ZANESVILLE ARMCO** | : | |
| **INDEPENDENT UNION, and** | : | |
| **UNITED STEELWORKERS OF** | : | |
| **AMERICA, AFL-CIO/CLC**, | : | |
| | : | |
| Defendant-Intervenors. | : | |
| | : | |

[United States International Trade Commission's countervailing and antidumping duty order sunset review determination remanded with instructions to conduct further proceedings in conformity with this opinion.]

Dated: December 24, 2002

    Gibson, Dunn & Crutcher, LLP (Joseph H. Price, Douglas R. Cox, Gracia M. Berg, Gregory C. Gerdes), for Plaintiff Nippon Steel Corporation.

    Arent Fox Kintner Plotkin & Kahn, PLLC (Robert H. Huey, Matthew J. Clark, Nancy A. Noonan, Steven F. Hill, Timothy D. Osterhaus), for Plaintiff Kawaski Steel Corporation.

    Hogan & Hartson, LLP (Lewis E. Leibowitz, Steven J. Routh, David G. Leitch, T. Clark

Weymouth, David P. Kassebaum), for Plaintiffs ThyssenKrupp Acciai Speciali Terni S.p.A. and Acciai Speciali Terni USA, Inc.

Lyn M. Schlitt, General Counsel, United States International Trade Commission; James M. Lyons, Deputy General Counsel, United States International Trade Commission (Gracemary Rizzo Roth-Roffy, Mark B. Rees), for Defendant United States International Trade Commission.

Collier Shannon Scott, PLLC (Kathleen W. Cannon, Michael J. Coursey, Eric R. McClafferty, John M. Herrmann, Grace W. Kim, David A. Hartquist), for Defendant-Intervenors Allegheny Ludlum Corporation, AK Steel Corporation, Butler Armco Independent Union, Zanesville Armco Independent Union, and the United Steelworkers of America, AFL-CIO/CLC.


**OPINION AND ORDER**

EATON, Judge:  This matter is before the court on motion for judgment upon the agency record pursuant to USCIT R. 56.2, as to counts three through nine of the Complaints filed by Nippon Steel Corporation ("Nippon"); Kawasaki Steel Corporation; ThyssenKrupp Acciai Speciali Terni S.p.A., and Acciai Speciali Terni USA, Inc. (collectively "Plaintiffs").[1]


The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(A)(i)(I) (2000).  In the context of an antidumping and countervailing duty review, the court will hold unlawful "any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i).

---

[1]        Each Plaintiff filed a Complaint in this consolidated action.  Plaintiffs make substantially identical allegations challenging several aspects of the United States International Trade Commission's sunset review determination concerning certain antidumping and countervailing duty orders on imports of grain-oriented silicon electrical steel from Italy and Japan.  For purposes of this opinion, the court follows the Nippon Complaint.

## BACKGROUND

On December 1, 1999, the United States International Trade Commission ("ITC" or

"Commission") instituted five year sunset reviews of the countervailing duty order on grain-

oriented silicon electrical steel ("GOES")[2] from Italy, and the antidumping duty orders on GOES

from Italy and Japan (the "Subject Orders"), pursuant to section 751(c) of the Tariff Act of 1930,

as amended, 19 U.S.C. § 1675(c) (2000).  See Grain-Oriented Silicon Elect. Steel From Italy and

Japan, 64 Fed. Reg. 67,318 (Int'l Trade Comm'n Dec. 1, 1999) (initiation of sunset rev.).  Notice

of the ITC's determination that revocation of the Subject Orders would be likely to lead to

continuation or recurrence of material injury to an industry in the United States within a

reasonably foreseeable time was published at 66 Fed. Reg. 12,958.  Grain-Oriented Silicon Elect.

Steel From Italy and Japan, 66 Fed. Reg. 12,958 (Int'l Trade Comm'n Mar. 1, 2001) (final

determ.); Grain-Oriented Silicon Elect. Steel From Italy and Japan, USITC Pub. 3369, Inv. Nos.

701-TA-355 and 731-TA-659-660 (Review) (Feb. 2001) ("Final Determination").  On August

30, 2002, this court denied Plaintiffs' motion for summary judgment as to counts one and two of

the Complaints, dealing with the validity of Dennis M. Devaney's appointment as a

---

[2]        The United States Department of Commerce ("Commerce") has defined GOES:

> [A] flat-rolled alloy steel product containing by weight at least 0.6
> percent of silicon, not more than 0.08 percent of carbon, not more
> than 1.0 percent of aluminum, and no other element in an amount
> that would give the steel the characteristics of another alloy steel,
> of a thickness of no more than 0.56 millimeters, in coils of any
> width, or in straight lengths which are of a width measuring at least
> 10 times the thickness . . . .

Grain-Oriented Elect. Steel From Italy and Japan, 65 Fed. Reg. 41,433, 41,433 (Dep't Commerce
July 5, 2000) (final results of expedited sunset reviews of antidumping duty orders).

Commissioner of the ITC and the lawfulness of his vote with respect to the Final Determination, and granted the ITC's cross-motion for summary judgment as to the same. See Nippon Steel Corp. v. United States Int'l Trade Comm'n, 26 CIT __, Slip Op. 02-100 (Aug. 30, 2002). Counts three through nine, which concern matters found in the Final Determination itself, are now before the court. For the reasons set forth below, the court remands this matter to the ITC with instructions to conduct further proceedings in conformity with this opinion.

## DISCUSSION

Plaintiffs contend that the Final Determination is not in accordance with law in three respects: (1) the ITC "misconstrued the nature of its inquiry" in applying the "likely" standard in 19 U.S.C. §§ 1675(c) and 1675a(a) by "engag[ing] in an analysis of what was possible or conceivable" rather than "determining what was likely or probable" (Pls.' Non-Conf. Mem. Supp. Mot. J. Agency R. at 6 ("Pls.' Mem.") (emphasis in original)); (2) the ITC failed to consider the four factors set forth in 19 U.S.C. § 1675a(a)(2)(A)–(D) in making its determination as to the significance of likely volume if the Subject Orders were revoked (id. at 7); and (3) the ITC failed to consider whether the likely volume of subject imports would be significant in either absolute or relative terms in accordance with 19 U.S.C. § 1675a(a)(2). (Id.)

In addition, Plaintiffs challenge various other aspects of the Final Determination as unsupported by substantial evidence on the record, including: (1) the ITC's cumulation determination (Pls.' Mem. at 6); and (2) the ITC's findings that, were the Subject Orders revoked, the likely volume would be significant, there likely would be significant price

underselling and price suppression or depression, and subject imports likely would have a

significant adverse impact on the domestic industry within a reasonably foreseeable time.  (Id. at

7.)


Common to each of Plaintiffs' Complaints, with respect to the ITC's methodology and its

assessment of the evidence on the record, is the meaning of the word "likely" found in 19 U.S.C.

§§ 1675(c) and 1675a(a).  Section 1675(c) provides in relevant part:

> [Five] years after the date of publication of—
>
>> (A) a countervailing duty order . . . [or] an
>> antidumping duty order . . .
>
> the Commission shall conduct a review to determine, in
> accordance with [19 U.S.C. § 1675a], whether revocation of the
> countervailing or antidumping duty order . . . would be likely to
> lead to continuation or recurrence . . . of material injury.

19 U.S.C. § 1675(c)(1) (2000).  Section 1675a(a)(1) provides in relevant part:

> The Commission shall consider the likely volume, price effect, and
> impact of imports of the subject merchandise on the industry if the
> order is revoked . . . .  The Commission shall take into account—
>
>> (A) its prior injury determinations, including the
>> volume, price effect, and impact of imports of the
>> subject merchandise on the industry before the order
>> was issued . . . ,
>>
>> (B) whether any improvement in the state of the
>> industry is related to the order . . . ,
>>
>> (C) whether the industry is vulnerable to material
>> injury if the order is revoked . . . , and
>>
>> (D) in an antidumping proceeding under [19 U.S.C.
>> § 1675(c)], the findings of the administering

authority regarding duty absorption under [19
U.S.C. § 1675(a)(4)].

19 U.S.C. § 1675a(a)(1)(A)–(D) (2000).

Plaintiffs urge that the language of the statute and case law interpreting the word "likely"

impose a "probable" standard and not a "possible" standard when evaluating likely volume, price

effect, and impact of the subject imports, and when determining whether revocation of the

Subject Orders would be likely to lead to continuation or recurrence of material injury to the

domestic industry.  In keeping with this view, Plaintiffs maintain that:

> [T]he correct legal standard is whether, based on the findings made
> by the ITC and the record evidence in this case, it was reasonable
> for the ITC to have found that revocation of the subject orders
> would be likely – i.e., probable – to lead to recurrence of material
> injury to the U.S. GOES industry within a reasonably foreseeable
> time.

(Pls.' Non-Conf. Reply to Def.'s and Def-Ints.' Resp. to Pls.' Mot. J. Agency R. at 3 (citing

Usinor Industeel, S.A. v. United States, 26 CIT __, __, Slip Op. 02-39 at 25 (Apr. 29, 2002)

(emphasis omitted).)  Accordingly, Plaintiffs contend that "[i]f the Commission does not find it

'likely' – i.e., probable – that such injury will occur, the statute is clear: the orders must be

removed."  (Pls.' Mem. at 6.)

The ITC argues that "a reading of the statute and the [Statement of Administrative

Action] quickly dispels any notion that Congress intended the term 'likely' to mean

'probable' . . . ."  (Def.'s Non-Conf. Resp. to Pls.' Mot. J. Agency R. at 15 ("Def.'s Resp.").)

The ITC claims that, by arguing that Congress used the word "likely" to mean probable,

Plaintiffs misstate the likelihood standard, and that "plaintiffs are effectively arguing that the record must weigh in one direction, and one direction only . . . a higher standard than is required for Commission determinations, which need be supported by substantial evidence . . . ." (Id. (citing Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984).) Moreover, the ITC argues that had Congress intended likely to mean probable it would have used the word "probable." (Id.)

In support of its argument, the ITC quotes the Statement of Administrative Action accompanying the Uruguay Round Agreements Act:

> The determination called for in these types of reviews is inherently predictive and speculative. There may be more than one likely outcome following revocation or termination. The possibility of other likely outcomes does not mean that a determination that revocation or termination is likely to lead to continuation or recurrence of dumping or countervailable subsidies, or injury, is erroneous, as long as the determination of likelihood of continuation or recurrence is reasonable in light of the facts of the case. In such situations, the order or suspended investigation will be continued.

Statement of Administrative Action, accompanying H.R. Rep. No. 103-826(I), at 883, reprinted in 1994 U.S.C.C.A.N. 4040, 4208–09 ("SAA"); (Def.'s Resp. at 16). Highlighting the phrase "[t]here may be more than one likely outcome," the ITC urges that this language militates against a finding that likely means probable and that "[a]s statutory interpretation requires, the SAA's instructions must be adhered to in defining 'likely.'" (Def.'s Resp. at 15 (emphasis omitted).)

The court finds that likely means probable within the context of 19 U.S.C. §§ 1675(c) and

1675a(a). It is well settled that "in all statutory construction cases, we begin with the language of the statute." Barnhart, Comm'r of Soc. Sec. v. Sigmon Coal Co., Inc., 534 U.S. 438, 450 (2002). "We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then this first canon is also the last: 'judicial inquiry is complete.'" Id. at 461–62 (citing Conn. Nat. Bank v. Germain, 503 U.S. 249, 253–54 (1992). Thus, the court must determine "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997), quoted in Barnhart, 534 U.S. at 450; see also Francis J. McCaffrey, Statutory Construction 4 (1953) ("A statute has a single meaning when its terms are plain and free from ambiguity, and do not admit of another meaning by the context." (citing People v. Schoonmaker, 63 Barb. 44 (N.Y. Gen. Term 1871)). Although the word "likely" is not defined by statute, its meaning is not ambiguous. "[U]ndefined terms in a statute are deemed to have their ordinarily understood meaning." Koyo Seiko Co. v. United States, 36 F.3d 1565, 1571 n.9 (Fed. Cir. 1994) (citing United States v. James, 478 U.S. 597, 604 (1986)). The common dictionary meaning of likely is probable. See, e.g., Webster's Third New International Dictionary 1310 (1981) ("[O]f such a nature or so circumstanced as to make something probable . . . ."); Merriam-Webster's Collegiate Dictionary 673 (10th ed. 2001) ("[H]aving a high probability of occurring or being true . . . ."); Black's Law Dictionary 925 (6th ed. 1990) ("Probable.").[3]

---

[3]    It might be argued that, although all dictionary sources examined define likely as meaning probable, the presence of other definitions introduces ambiguity as to the word's true meaning. An example of this is the definition of likely as "plausible" found in certain sources. See, e.g., Webster's II New Riverside University Dictionary (1994). Words, however, have meaning in context. Thus, words with multiple definitions gain their sense from their

Indeed, this court has previously found likely to mean probable within the context of 19

U.S.C. § 1675.  In Usinor Industeel, S.A. v. United States, the court, examining likely in the

context of a finding by the ITC that subject imports would be likely to compete with each other,

held that the language of the statute was clear and unambiguous and that "'[l]ikely' means

'likely'– that is, probable."  26 CIT __, __, Slip Op. 02-39 at 13 (Apr. 29, 2002) ("Industeel I")

(emphasis in original).  In Usinor v. United States, the court, relying on the ordinary dictionary

meaning of likely, held that the meaning of likely is probable, not merely possible.  26 CIT __,

__, Slip Op. 02-70 at 43 (July 19, 2002) ("Usinor"); see also AG der Dillinger Hüttenwerke v.

United States, 26 CIT __, __, Slip Op. 02-107 at 18 & n.14 (Sept. 5, 2002) (finding in the context

of a countervailing duty sunset review determination that "[i]t is not sufficient for Commerce

surroundings, i.e., "the language surrounding and accompanying the terms in question."
McCaffrey, at 4.

Therefore, an examination of whether some other definition of likely could introduce ambiguity into the meaning of that word as being probable, requires asking if this other definition could validly be used in the context of the statute.  Thus, plausible, which means "superficially fair," see Merriam-Webster's Collegiate Dictionary, at 890, could not be said to be a substitute for likely in the context of the subject statutes: "[T]he Commission shall conduct a review to determine, in accordance with [19 U.S.C. § 1675a], whether revocation of the countervailing or antidumping duty order . . . would be likely to lead to continuation or recurrence . . . of material injury"; "The Commission shall consider the likely volume, price effect, and impact of imports of the subject merchandise on the industry if the order is revoked . . . ."  19 U.S.C. §§ 1675(c), 1675a(a)(1) (emphasis added).  It is evident that the idea of superficial fairness is not accommodated by the context provided by the statutes.  As the two meanings stand alone when each is used in its proper context, one cannot be said to influence the meaning of the other.  Nor can the definitions of likely as both probable and plausible be added together and averaged to arrive at the definition proposed by counsel for the ITC that likely means "'more than a mere possibility,' but certainly less than 'probable.'"  Tr. at 121:2–3.  Simply put, no amount of argument can change the meaning of likely in sections 1675(c) and 1675a(a) to anything other than probable.  Moreover, this a not case where some public policy would compel a different result, as it does not present the "rare and exceptional circumstances" that would justify overlooking the plain, unambiguous words of the statute. See Crooks v. Harrelson, 282 U.S. 55, 60 (1930).

merely to indicate the possibility that benefits [under an alleged subsidy program] could still be given under the program. Rather, Commerce must make factual findings that would indicate whether such benefits would be probable" or "more likely so than not." (emphasis in original)).

Moreover, the ITC's reliance on the SAA to define "likely" is misplaced. The SAA is "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and [the Uruguay Round Agreements] Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d) (2000) (emphasis added). However, while it is "an authoritative expression . . . concerning [the] interpretation" of the statute, it does not replace the clear language of the statute itself. Resort to the SAA is unnecessary where the statutory term is unambiguous. See Usinor Industeel, S.A. v. United States, 26 CIT __, __, Slip Op. 02-75 at 3 (July 30, 2002) ("Industeel II") ("If a statutory term or phrase were ambiguous and in need of interpretation, the court would look to the SAA first and foremost for direction." (citing Taiwan Semiconductor Indus. Ass'n v. United States, 23 CIT 410, 413 n.6, 59 F. Supp. 2d 1324, 1328 n.6 (1999)). As the court finds that the statutory term is clear, it is not necessary to consult the SAA, and "'judicial inquiry is complete . . . .'" Rubin v. United States, 449 U.S. 424, 430 (1981), cited in Barnhart, 534 U.S. at 462; see Industeel II, 26 CIT at __, Slip Op. 02-75 at 4 (finding "likely" as it appears in statute is clear, thus resort to SAA unnecessary); see also Usinor, 26 CIT at __, Slip Op. 02-70 at 43–44 (concluding "that the meaning of [likely] is clear and terminat[ing] its inquiry there."); cf. Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1383–84 (Fed. Cir. 2001) (upholding Commerce's reasonable interpretation of an ambiguous statutory term made in the

course of an antidumping determination where more than one possible dictionary meaning applied).

The ITC does not expressly state which standard it applied in the Final Determination itself. In its brief and at oral argument, however, counsel for the ITC made it clear that the ITC did not apply the probable standard. (See Def.'s Resp. at 16 ("[T]he Commission made its determinations based on what the record indicated were the 'likely' outcomes.")); Tr. at 119:19–20 ("'Likely' means it's likely."); Tr. at 121:1–3 ("'[L]ikely' would be something to the effect that it's 'more than a mere possibility,' but certainly less than 'probable.'"). This being the case, on remand, the ITC shall reconsider its findings made pursuant to sections 1675(c) and 1675a(a) using the probable standard.

In addition to their more general claims with respect to the meaning of the word likely, Plaintiffs challenge the ITC's determination as to likely volume as not being in accordance with law in two respects: (1) the ITC failed to "consider[] the four requisite statutory economic factors [found in section 1675a(a)(2)] in assessing the likely volume of subject imports"; and (2) the ITC "fail[ed] to determine whether the likely volume of subject imports 'would be significant . . . either in absolute terms or relative to production or consumption in the United States,'" as section 1675a(a)(2) requires. (Pls.' Mem. at 19, 21 (emphasis omitted).)

The ITC claims that the Final Determination satisfies the requirements of section 1675a(a)(2). As to Plaintiffs' first argument, the ITC maintains that "it must consider 'all

relevant economic factors' including the four enumerated statutory factors," and that "the operative word is <u>consider</u>." (Def.'s Resp. at 31 (emphasis in original).) As to Plaintiffs' second argument, the ITC contends that "it is quite evident from the Commission's determination that it considered likely volume significant relative to production and consumption." (<u>Id.</u>)

Section 1675a(a)(2) provides in relevant part:

> In evaluating the likely volume of imports of the subject merchandise if the order is revoked . . . the Commission shall consider whether the likely volume of imports of the subject merchandise would be significant if the order is revoked . . . either in absolute terms or relative to production or consumption in the United States. In so doing, the Commission shall consider all relevant economic factors, including—
>
> > (A) any likely increase in production capacity or existing unused production capacity in the exporting country,
> >
> > (B) existing inventories of the subject merchandise, or likely increases in inventories,
> >
> > (C) the existence of barriers to the importation of such merchandise into countries other than the United States, and
> >
> > (D) the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products.

19 U.S.C. § 1675a(a)(2)(A)–(D) (2000). As for consideration of the factors enumerated in section 1675a(a)(2)(A)–(D), the Court of Appeals for the Federal Circuit has held that relevant economic factors set out in a statute, as those which the ITC "shall consider," represent the "Congressionally mandated 'minimum' analysis" that shall be undertaken in making an injury

determination. See Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB, 975 F.2d 807, 814 (Fed. Cir. 1992) (stating that the "core factors" set forth in 19 U.S.C. § 1677(7)(B)(iii) and (C)(iii), which the ITC "shall" consider, represent the requisite minimum analysis to be undertaken by the agency); see Ad Hoc Comm. of Domestic Uranium Prod. v. United States, 25 CIT __, __, 162 F. Supp. 2d 649, 655 (2001) (noting that the ITC considered "capacity utilization, . . . inventories, and . . . projected increase in production capacity . . . each of which it is required to consider under § 1675[a](a)(2).").  While the ITC is not required to mechanistically recite the statutorily enumerated factors, the ITC is required to consider all relevant economic factors, including those set out in the statute, and to do so in such a way that their consideration is discernible.  Ceramica Regiomontana, S.A. v. United States, 810 F.2d 1137, 1139 (Fed. Cir. 1987) (per curiam) ("A court may 'uphold [an agency's] decision of less than ideal clarity if the agency's path may reasonably be discerned.'"(quoting Bowman Transp. v. Ark.-Best Freight Sys., 419 U.S. 281, 286 (1974)).

In the Final Determination, the ITC concluded "that the likely volume of cumulated subject imports from Italy and Japan would be significant within a reasonably foreseeable time if the orders were revoked." Final Determination, at 18.  A reading of the ITC's volume analysis reveals that the ITC has not provided any indication that it gave consideration to the factors outlined in 19 U.S.C. § 1675a(a)(2)(A)–(D).  First, as to production capacity, the ITC found that "there is considerable capacity to produce GOES in the subject countries." Id. at 17.  Nowhere in its analysis, however, did the ITC give consideration to "any likely increase" in production capacity or existing unused capacity in the subject countries as 19 U.S.C. § 1675a(a)(2)(A)

requires. Second, the ITC neither addresses "existing inventories of the subject merchandise, or likely increases in inventories" nor mentions the existence of barriers to the importation of GOES into countries other than the United States. On the contrary, the ITC acknowledges that "a substantial portion of their exports that were being shipped to the United States have made their way to other markets." Id. Finally, the ITC does not discuss potential product shifting among facilities in Italy and Japan that can produce the subject merchandise. Thus, it is unclear how, if at all, consideration of these factors weighed in the ITC's determination as to significance of likely volume, and on remand, the ITC shall demonstrate that it considered those factors set out in 19 U.S.C. § 1675a(a)(2)(A)–(D), such that this consideration is reasonably discernible. See Ceramica Regiomontana, 810 F.2d at 1139.

In examining whether the ITC has satisfied the statutory injunction to "consider whether the likely volume of imports of the subject merchandise would be significant if the order is revoked . . . either in absolute terms or relative to production or consumption in the United States," it is not necessary to find that at each point the ITC clearly labeled its findings by appending statutory language as a marker. As with the court's holding with respect to the factors set out in 19 U.S.C. § 1675a(a)(2), however, such consideration must be reasonably discernible. Id.

Here, despite the ITC's argument to the contrary, it is not apparent that the ITC "consider[ed] whether the likely volume of imports of the subject merchandise would be significant if the order[s were] revoked . . . either in absolute terms or relative to production or

consumption in the United States." 19 U.S.C. § 1675a(a)(2). While the ITC considered the percentage of U.S. consumption represented by Italy's and Japan's production capacities, there is nothing to indicate that it considered "whether the likely volume of imports of the subject merchandise would be significant" either in absolute terms or relative to United States production or consumption. Id. (emphasis added). In fact, the only reference to this factor found in the Final Determination is: "In 1999 reported GOES production capacity in the subject countries totaled [  ] short tons, almost [  ] U.S. apparent consumption for the same year." Final Determination, at 17. By its terms, the statute requires a comparison of likely imports, not of existing capacity, to U.S. production or consumption. By merely selecting one of the statutory factors relevant to its volume determination and making a comparison with U.S. "apparent" consumption, the ITC fell short of satisfying the statutory requirement. Thus, on remand, the ITC shall demonstrate that it considered whether the likely volume of imports of the subject merchandise would be significant if the Subject Orders were revoked either in absolute terms or relative to production or consumption in the United States, such that this consideration is reasonably discernible.

        In light of the court's finding with respect to the Plaintiffs' in accordance with law arguments, it would be premature to address Plaintiffs' substantial evidence arguments at this time. The court notes, however, that a reading of the dissenting views of Commissioners Okun and Hillman, and the Staff Report on which they rely, raises serious questions concerning the determination that likely volume would be significant.

## CONCLUSION

This matter is remanded to the ITC so that it shall: (1) determine, in accordance with the court's finding as to the meaning of "likely" within the context of sections 1675(c) and 1675a(a), whether revocation of the Subject Orders would be likely to lead to continuation or recurrence of material injury, upon consideration of the likely volume, price effect, and impact of imports of the subject merchandise on the industry; and (2) demonstrate, in conformity with this opinion, (a) that it performed the requisite analysis by considering each of the four factors outlined in 19 U.S.C. § 1675a(a)(2)(A)–(D); and (b) that it considered whether, were the Subject Orders revoked, the likely volume of imports of the subject merchandise would be significant either in absolute terms or relative to production or consumption in the United States, pursuant to 19 U.S.C. § 1675a(a)(2). Such remand results are due within 90 days of this opinion, comments are due thirty days thereafter, and replies to such comments 11 days from their filing.

_____
Richard K. Eaton

Dated: December 24, 2002
       New York, New York